Thank you, Judge Smith, and may it please the Court. The District Court in this case concluded that the Texas Prompt Pay Statute applies to administrators of self-funded ERISA plans, and that so construed, the statute is not preempted by federal law. We submit today that both of those conclusions are mistaken. On the state law issue, we stand by the well-reasoned opinion of Judge Boyle in the Companion case. I think the two key aspects of that opinion that bears on the state law question are the two applicability criteria, neither of which are met by administrators of self-funded plans. The first one is that when Aetna administers a self-funded plan, it is not acted as an insurer within the definition of the Texas Prompt Pay Stat. It is not acting as an insurer in that capacity, but it is still an insurer. It is an insurer when acting in other capacities under Chapter 841. I draw your attention to the fact that this particular statute, Chapter 1301, actually refers to somebody who is operating under certain enumerated chapters, including 841. And it seems obvious to us that in adding that extra language, that the entity is operating under one of the enumerated chapters, it has to be acting in its capacity as an insurer. That is to say, the assumption of the financial risk of coverage. When Aetna acts for self-funded plans as an administrator, it is not acting under Chapter 841. It is acting under Chapter 4151. But if you were not persuaded by that, you know, the statute on its applicability section, it's also very clear that there is a second aspect of the applicability section that is not met by the administrators of self-funded plans, and that is that the insurer must pay for the coverage through the insurer's health insurance policy. And it is— Can you explain to us, and I understand that we take the statute as it reads, but can you explain to us any reason why the legislature would have made the distinction that you're urging on us? What would have been the policy reason or the justification for that? Oh, surely. I mean, there is a long history, and this gets us a little bit in advance to our second argument, of the states having power to regulate the risk-bearing aspects of the insurance market. Going back to the Commerce Clause cases, and now incorporated in the federal statute that we deal with here, there is a recognition that there is a special role for the states in dealing with the insurance aspect, that is to say, the risk-bearing aspect of this. But by the same token, there is an equally well-settled understanding that is reflected in the Deamer Clause of Section 514, that although states may claim that self-funded plans in some respects are functionally equivalent in their assumption of risk, that states are not permitted to treat self-funded plans for national companies as here, as insurance. In the words of the statute, they may not be deemed insurance. So just as a background premise, given that this has been the law for decades, every state legislature has been working for decades on an understanding that even if policymakers might think that these things are functionally equivalent, that there are bounds to what a state legislature can do. It has rarely been attempted, but when it has been, as in the 11th Circuit case dealing with the Georgia case, it has been found to be preempted by federal law. Now, the Georgia statute in the Hudgens case is sort of interesting because it had a long history of many efforts trying to extend the applicability of prompt pay statutes to self-funded plans and their administrators. The first time the statute passed the Georgia legislature, it was vetoed by the governor on the stated ground that it was preempted by the federal statute. It was then passed again, and a subsequent governor signed it. It was then enjoined by the federal district court in an opinion that was affirmed by the 11th Circuit. Now, that gets us a little bit ahead, and there's just one other thing that I'd like to mention about the hospital's argument under the state statute, and that is there is a new reference in the briefing to subsection 109 that deals with administrators who act for insurers. This was never mentioned by the hospitals in our case, and the state court action was never cited in the district court. If it were remotely applicable, any claim under it would be forfeited, but in any event, it is not relevant here because even under section 109, the hospitals would have to identify a statutory insurer. And what 109 does basically is if you have somebody who's operating under 841, somebody who is, in fact, assuming the financial risk of coverage, that person, if it delegates certain administrative functions, may not escape the duties of the statute on the insurance side simply by having an administrator. This is not uncommon. You can look at the website of the Texas Department of Insurance to see who the administrators are and who the insurers are. There is no total overlap. There are certain services like acupuncture, physical therapy, infusion therapies, where certain dedicated administrators have their own network of providers, and even insurers contract with them as administrator for the insurer to deal with those aspects of coverage. But under the statute, you still have to identify a statutory insurer, which is not the case here because the only arguable statutory insurer would be the self-funded plan. Now, having said that much about the state law issues, which, as I said, I think were amply covered by Judge Boyle in the companion case, let me say a word about the preemption issue. Now, obviously, the first word on that is that if you agree with us on the state law construction issues, there are no need to reach the federal question. You know, the case is over at that point. But if you were to conclude that the ... Well, but we could, if we wanted to make alternative holdings, because it seems to me that if we simply parsed the language of the statute and said it isn't covered, the legislature might want to go back and change that. Certainly. And you'd have to have another round of litigation on the preemption issue. And we would welcome that. I mean, these issues that you can see from your own cases do come up a lot over the cases. I already mentioned the Hudgins opinion from the Court of Appeals in the Eleventh Circuit, which I think is the most recent and opposite to the issues that are in front of you today. But these issues are also covered by your own case law. And the fundamental insight here is that your test for coverage under Section 514 really does look as whether this deals with a central issue of plan administration. And determining whether claims are covered and on what terms, it is possibly the most central issue of plan administration. You have had occasion to deal tangentially with many of these issues in your cases. Prompt pay statutes have been raised in some of your cases. And in each case that you have come up with one of these, you have found that the particular claim is preempted by Section 514. I would like to draw your attention to two in particular. The Bank of Louisiana case. If you look at footnote 6 in the case, you will see that there was a claim raised by the bank under a parallel set of duties in a Louisiana statute. And it's one of the things that the Court held in its closing paragraph in the opinion was preempted by Section 514. You more recently dealt with similar claims in the context of the HMO statute analog under Texas law in the North Cypress case, where you again affirmed the conclusion of the District Court that the prompt pay duties and penalties were preempted by the federal statute, Section 514, and not even saved by the insurance savings clause because they did not meet the Miller test. Now, I should pause to address, you know, the significant contention that the hospitals make here, which is principally based on the potential applicability of the Lone Star case. Now, let me start by making clear that the Lone Star case dealt with the doctrine of complete preemption under Section 502, which deals with the claim is, whether the claim is so completely overtaken by federal law that it gives you a federal cause of action and extinguishes any state cause of action. A claim can fail to qualify for Section 502 and still be preempted by the much broader Section 514, which we think applies here. But in any event, we believe that the hospitals' contentions with respect to Lone Star are also in error because they vastly overstate the import of what this Court was doing in Lone Star. Following the teaching of the Supreme Court's opinion in Davila, also dealing with Section 502, the— Dear and dear to my heart, since I was unanimously reversed by the Supreme Court in that case. And I hope to the heavens that you do not, you know, recall how that came about. The—following the teaching of the Davila case, the Lone Star sort of asked whether the claim at issue in the case was based on a truly independent state court duty. And it identified the rate that had been agreed to as something that had no analog. It was not anchored on anything that was, you know, required by the plan. If you had independently agreed to pay X rather than Y, that was something that was truly a voluntarily acquired state law duty. That is extremely narrow. And we know how narrow it is because the outcome of the Lone Star case was a remand to the district court. And I would like to draw your attention to the closing page of that opinion, which is at page 533, where you stated, you know, the holding. And you know, the holding was as follows. We hold that claims for underpayment under the provider agreement, which do not implicate coverage determinations under the terms of the relevant plan, are not preempted by arrest. In order for the rate claim not to be saved, it has to be demonstrated that the claim does not implicate a coverage determination. And in that case, in the very next paragraph, the court sent the case back to the district court because it was not clear whether the failure to pay has been based in part on a coverage determination—some claims were only partially covered—or an error in the application of the rate. And so, you know, the contention that the hospitals have in this case, that the case broadly establishes a category of claims that can be brought by doctors or hospitals under contracts, is just not supported by the case. If I could just mention two aspects of the record in this case that tie this point to the record, it is undisputed that the duty imposed by the Texas statute in this case does involve an inquiry into a coverage determination. We know that because Section 103 imposes a duty to determine, quote, whether the claim is payable, unquote. Now, whether the claim is actually payable in the context of this case turns at least on two aspects of the contracts. First, both of the contracts at issue here expressly require an assignment of claim from the plaintiffs. So you can see from that aspect of the case alone that the claim being raised under the contract is not remotely independent of the coverage determination because the claim is not payable in the absence of an assignment. That is, Section 4.5 of the Methodist contract, record on appeal at 202, and Section 4.1.1 of the THR contract, record on appeal at 243. The second aspect of the contracts that are relevant to the potential applicability of the claims in fact must be covered under the terms of the relevant plans. And so a claim could not be payable under the statute unless there has been a demonstration and a determination both that there is an assignment from the plaintiff and that the plan that underlies the coverage for the patient is in fact one that provides coverage for the treatment. That is, Section 12.5 of the Methodist contract, record on appeal at 209, and Section 1.15 of the THR contract, record on appeal 236. I think that's all I have. I have additional arguments under Section 503. I will say about those only that the obvious purpose of Section 503 is for Congress to give to the Department of Labor the authority to regulate the timing and process of claim payment. The Department of Labor has issued extensive regulations on when claims must be paid and what consequences follow from failure to pay in accordance with the Section 503 regulations. Those include, you know, the waiving of the exhaustion bar that usually would apply among others. And so this is an area that not only on the face of Section 514 is covered by your case law and by the statute and the views of other circuits, but also one where you can see from the terms of Section 503 is comprehensively regulated by federal law and central to a federal concern. Thank you, Your Honor. Thank you, Mr. Estrada. You've saved time for rebuttal. Mr. Skidmore. Good afternoon. May it please the Court. I want to address the arguments that were made by Counsel F. Retina, but before I get into that, I also want to address a couple of very preliminary issues, one of which has to do with the scope of the issues the Court is hearing today. There were two issues in broad terms that were presented at the trial court. One had to do with statutory interpretation, the other had to do with preemption. In the decision that was rendered by Judge Lynn in March of this year, it was very clear that the Court only intended to exercise jurisdiction over the preemption issue and was abstaining from making a decision on the statutory interpretation issue. Under this Court's decision in Earl . . . Well, you say it was clear that the Court abstained from making a determination? Yes, Your Honor. Well, but didn't she say in the order, I'm abstaining, but I'm deferring to the State Court's determination? Yes, Your Honor. She did say that she . . . With the deference being given after knowing what the State Court's determination was? Yes, Your Honor. That's right. And so, why is it a reasonable inference that the judge deferred because the judge approved of the State Court's result, outcome? Right. In making that decision to defer to the State Court opinion, the Court was not exercising its jurisdiction or making any determination independently as to whether the statute actually applied. But the State Court had already rendered, hadn't it? Well, it had rendered a decision in a separate matter, that's correct. Yeah. So, under the Court's decision in Earl, the standard review for a case when the trial court decides to abstain from exercising jurisdiction is to look for an abuse of discretion. And there's also review of the factors underlying that abstention on a de novo review. Now, Aetna has not challenged the Court's decision as an abuse of discretion. There has not been any briefing on the different factors under Bilhart or Wilton. So on the basis of that briefing and the fact that the Court did abstain, the appropriate result in this case would simply be to affirm the Court's decision to only exercise jurisdiction as to the preemption issue. Alternatively, if the Court does find that there was an abuse of discretion, then the proper result would then be to remand the case back to Judge Lynn to enter a decision on the statutory interpretation question. The second threshold issue— Why would that be the proper disposition rather than for us to decide the issue if it's a question of law? Well, if, again, the Court had decided—the issue to be decided is, was there an abuse of discretion in deciding not to address the statutory interpretation issue? And if that was an abuse of discretion, then the trial court should have an opportunity to address that itself. The second threshold issue that I wanted to address is the question of certification. Under Rule 58.1 of the Texas Rules of Appellate Procedure, the Texas Supreme Court will answer certified questions by an appellate court, a federal appellate court, when there is a determinative issue of Texas law that has not been addressed determinatively by the Texas Supreme Court. The Toronto case does provide authority that does address the question of interpretation of what is an insurer, but to the extent that there are other determinative questions of Texas law that have not been addressed by the Texas Supreme Court, then this is a case that is appropriate for certification to the Texas Supreme Court, and that's something that Aetna has acknowledged in its own briefing on pages 35 and 36 of the principal brief. It would be appropriate for us to do that, I assume, only if we were to decide that there's no preemption here. Well, I think that's, I think perhaps that if the Court were to decide that there is a threshold interpretation issue that does need to be addressed, it would be appropriate to certify the question to the Texas Supreme Court and withhold decision on the preemption issue. Well, but then the certified question wouldn't be a dispositive question, necessarily. Well, I think it would be, because if the Court finds that there is, as Aetna's counsel just argued, if there is no application of the statute to the self-funded plans in this case, then there is really no need to decide the preemption question. I do want to address some of the substantive issues that counsel for Aetna had raised on the interpretation question to the extent that that's one the Court is going to address, but to give that question some context, there is, Aetna has urged that there is this distinction in the law between a self-funded plan and a fully insured plan. And in the briefing that's been raised by not only Aetna, but also by the amicus parties, it's clear that many, many insurers or many, many employers are now using self-funded plans to provide health insurance coverage to their employees. According to Aetna, 75% of the plans they administer are for employer self-funded plans. According to the amicus parties, 150 million Americans receive their health insurance coverage from an employer's self-funded plan. That's 61% of all employer benefit plans, and for employers with more than 200 employees, that's 81%. If you were to ask any of those employees who receive their health insurance coverage from a self-funded plan whether they are insured, undoubtedly the answer to that question would be yes, they are. The interpretation that Aetna has offered this court is that even though those individuals are clearly insured, there is no insurer and there is no health insurance policy. By comparison, the interpretation that the hospitals have offered provides not only an interpretation that is consistent with the language in the statute, but is also consistent with the way that those millions of Americans understand and experience the health insurance plans that they receive from their employer's self-funded plan. On the question of whether there is an insurer, Aetna has argued that the statute actually requires that there be a capacity or some functionality as an insurer. That's simply not found in the terms of the statute. Under 1301.0015, an insurer is defined as, among other things, a health insurance company or other company operating under 841 that is authorized to issue, deliver, or issue for delivery in the state health insurance policies. Aetna is clearly authorized in this state to issue health insurance policies. It is a health insurance company that is licensed here in Texas. That authorization and that licensure doesn't change when it acts in the capacity of a third party administrator for a self-funded plan. It's not. You're saying they can't have a subsidiary that does nothing but administering plans for a self-funded. Well, the entity that in this case that factually administers the plans is a licensed Texas insurance company. Now, the argument was raised- But isn't it operating under a different chapter when it's serving only as an administrator and not an insurer? Well, let me address that. Chapter 841, Aetna's argued that that's a requirement that you have to be operating under 841. Chapter 841 defines a health insurance company operating under that chapter as a corporation authorized under a charter to engage in business involving the payment of money or another thing of value in the event of loss resulting from disability incurred as a result of sickness or ill health. Even if you were only to focus on the conduct that Aetna performs as a third party administrator, it fits the definition of a company operating under 841 under that statute. So regardless of whether you interpret the statute to require that as a function, again, as a third party administrator, the plain language of the statute is met. Tell us what it is in this case under the facts that constitute, quote, health insurance policies. Sure. The definition of a health insurance policy under the statute is a contract, excuse me, a group or individual insurance policy certificate or contract providing benefits for medical or surgical expenses incurred as a result of accident or sickness. In this case, there are a multitude of different contracts. The preferred provider agreement between the hospitals and Aetna qualifies as an insurance policy. The administrative services agreement between Aetna and the self-funded plan qualifies as an insurance policy. And separately, we have the benefit in this case of having in the record the summary plan documents or summary plan descriptions that by federal law, the plan is required to issue that describes what benefits are afforded to the employee beneficiaries under the self-funded plan. Each one of those documents either individually or collectively qualifies as an insurance policy under the terms of the statute. And to give you an example, the language from the Aetna agreement with Methodist Hospitals, this is the preferred provider agreement, shows that this is a contract that provides insurance benefits to members. This is at the record 791 hospital agrees to render to members hospital care, facilities, equipment and services which are covered services under members plan. On the next page, company, this is referring to Aetna, shall or when not the applicable payer shall notify payers to pay hospital for hospital services rendered to members in accordance with the rates set forth in the compensation schedule. Similar language is found in the Aetna and THR agreement. Hospital, this is a record at 832. Hospital will make available and provide services to members in the same manner, in accordance with the same standards and with the same availability offered to other patients of the hospital. 838, company agrees to pay hospital for covered services rendered to members of full risk plans and the notify plan sponsors to forward payment to hospital for covered services rendered to plan sponsors members. So in each of these agreements, it's an exchange of covered services, medical and surgical services to the plan beneficiaries in exchange for insurance proceeds paid by the third party administrator. So again, the plain language of the statute is met. Under the summary plan document, this is an even clearer case for insurance policy. I'm reading from the record at 2747. This Aetna Choice POS2 plan provides access to covered benefits through a network of healthcare providers and facilities. These network providers have contracted with Aetna, an affiliate or third party vendor, to provide healthcare services and supplies to Aetna plan members at reduced fee called a negotiated charge. Again, this is a document that the beneficiaries, the employees of self-funded plans, look to to find out what they are covered for. There is no clearer case. Methodist hospital employees, those are patients, correct? This is, the example that I read from is from a company called Cognizant, which is an employer whose benefit plan is administered by Aetna. And it's those employees who look to this document to figure out exactly what benefits they're entitled to under their employer benefit plan. And if it's an employer funded plan, they look to the employer's plan, not to Aetna. Well, as the language I just quoted says, this is clearly Aetna's plan. It refers to Aetna Choice POS2 plan. And I can read you multiple examples throughout this document where the employer is only mentioned once in the very beginning. Everywhere else, this is referred to as an Aetna benefit plan. And it's in fact a document that Aetna authored and created, not only for Cognizant, but for a number of other insurers. At base, it is the employer's plan. It is the employer's plan, but it is Aetna's document that outlines the benefits that are afforded under that plan. If it's the employer's plan and self-funded, if somebody uses a document that they get off the Internet, it doesn't matter. Well, the requirement in the statute says that it has to be the insurer's insurance policy. And the insurer here being Aetna, this qualifies as Aetna's insurance policy because it's a document that it is authored. It's a document that Aetna itself describes as its own insurance plan. What part, if any, does Aetna play in the sharing of the risks under the scheme that you've described? Well, let me just address that briefly. The statute, to be clear, doesn't require, there's nothing in the terms of the statute that requires the insurer to bear risk. But isn't that just inherent in any insurance policy, that it's a sharing of or a bearing of risks? Not necessarily, and to use an example, the Toronto case is a perfect example of that. In that case, the question was, does Blue Cross Blue Shield qualify as an insurer under a different provision in the insurance code that has to do with the prohibition on the assignment of benefits? And in that case, the very similar definition of insurer, it required that the entity be authorized under subchapter three of the insurance code. There was nothing in the statute that required anyone to bear any risk. In that case, Blue Cross Blue Shield argued that because it was only acting as a third party administrator, that it wasn't an insurer because it wasn't bearing any risk. The court in that case found that it nonetheless was an insurer under that statute because it qualified under the terms of the provision requiring authorization under subchapter three of the insurance code. Here, the analysis is the same. The statute requires an authorization to issue insurance policies, and clearly, AEDNA has that authority, even as a third party administrator. But you're conceding, counsel, that in Toronto, we're talking about a chapter three definition of insurer, and that we're talking about a completely different chapter in this case. It is a different chapter, and some of the language is different, but the analysis in that court's case, the reason they decided that it would be an insurer is because it had the authority under subchapter three. Here again, where there is a requirement that there be authority to issue an insurance policy. That's clearly established in this matter. You need to save some time for a preemption, Mr. Yes, I do want to address preemption. And let me address that in the context of the Hudgens case, which was mentioned by counsel. The Hudgens case dealt with a completely different kind of statute. Chapter 1301 of the insurance code requires, as one of its signature requirements, that there be a contract between the insurer and the healthcare provider. That is what, when you look at the legislative history for this matter, for the statute, that's what the legislature intended to regulate, was the contract between the insurance carrier, or the insurer, and the provider. In the Hudgens case, which in that case obviously found that there was preemption, there was not that requirement. And in fact, out of network providers, parties that didn't have any contract at all, beneficiaries in the POS under the plan could have asserted claims under the Georgia statute in that case. That Hudgens case also did not follow this court's precedent in terms of what constitutes relating to an employee benefit plan for purposes of preemption. Under this court's analysis, there has to be an exclusive area of federal concern addressed by the statute. And there has to be one that impacts the relationship between traditional RISA entities. In Hudgens, they didn't follow that analysis. In fact, the court found in that case that the relationship between traditional RISA entities was irrelevant. That's not following the Fifth Circuit precedent. Instead, the Hudgens case focused exclusively on what burden might be imposed on the plan as a result of being subject to this statute. Frankly, there isn't any evidence in contrast to Hudgens. There's no evidence in the record at all that Edna is going to experience any burden as a result of administering self-funded plans and being subject to the statute. In fact, if you look at their briefing on page nine of their principal brief, they again say that they administer 75% of their docket of self-funded plans are self-funded. 25% of them are not. For the 25% of the plans that Edna administers, in which it is not administering a self-funded plan, and is clearly subject to these prompt payment regulations, it already has the corporate machinery in place to make sure that they are compliant with those statutes. And therefore, there's no additional incremental burden that's imposed on Edna by being subject to those requirements in the context of a self-funded plan. Edna has argued that the cases that the hospitals are relying upon for their 514 of the statute, there are a number of cases that have been cited that involve both express preemption and preemption under complete preemption. Those cases are the access Medicaid case, 2007 case from the Fifth Circuit. Baylor versus Blue Cross Blue Shield of Arkansas. Baylor versus Epoch, Northbrook Insurance Company, Foley. Methodist Hospitals versus Edna, a 2014 decision from Judge Boyle. THR versus Edna, another 2014 decision, and South Texas Spinal. In each one of those cases, the court was construing or considering preemption in the context of a breach of contract claim, or in many cases, the actual prompt payment statutes that we're here to discuss today. And in all of those cases, the court found that because the provider was not acting on behalf of a beneficiary, but as a party to an independent contract, that there was no exclusive federal concern, and there was no impact on traditional ERISA entities. And in fact, in this case, what is notable is that in Edna's, Edna is not a ERISA fiduciary, and frankly, the hospitals don't have any standing under ERISA to pursue claims, so there isn't any overlap. There isn't any conduct that implicates a determination over coverage. That's another argument that Edna made in its principle argument was that somehow, by going through and adjudicating these prompt payment claims, someone's going to have to make a determination over coverage. That simply isn't the case. There's nothing in the record, and frankly, nothing in the briefing that suggests that there is a fact issue over whether there is going to be a coverage claim or not. And keep in mind that Edna moved for summary judgment. If they really believed that there were fact issues over whether they were covered claims or uncovered claims, they would never have made that, would never have moved for summary judgment. Just in closing, all of the cases that Edna has relied upon, including the Davila case, North Cyprus case, those involved, either cases where there was no provider at all, or where the provider was acting on behalf of a beneficiary of a plan. This is not that case. And the only cases that have been addressed here are cases where coverage is not contested, and there has been payment by the insurance company. Thank you very much. Thank you, Mr. Skidmore. Mr. Estrada, you save time for rebuttal. Yes, Your Honor, very briefly. Let me just say first that the so-called abstention is actually a misapplication of the ERA principle. The court, in fact, did not purport to abstain. It did not forbear from exercising its judicial power. It did exercise it by adopting a state rule ruling and then basing a federal law ruling, we believe, incorrectly on that. That is not abstention. That is a misapplication of a rule of law on both counts. Both of those things are, as the Supreme Court said in Kuhn, always reviewable, denoble, because a court always abuses its discretion when it makes an error of law. The issue of state law, obviously, is in front of you in any event. Even if the abstention claim had any merit, there would be no point in sending this issue back to Judge Lynn because you have to decide it in the case of Blue Cross and Blue Shield. As Judge Smith pointed out, we believe, certainly it is our submission, that the federal preemption issue is so clear that even if you harbored any doubts on the state law issues, which I do not believe you should, you would be well within your discretion by issuing a ruling that avoids the need for asking the Texas courts and by simply ruling that the issue is already clear under federal law. And should the issue actually arise under the state law, it would not be a claim in any event. The issue of possible certification would only arise if you were not disposed to reach the federal question and wanted the answer to the state law issue first. There is no requirement that you do that. We heard the claim that self-funded plans are increasing, and that to be sure may be true. That is, I think, an indication of the growth of the national economy. Companies that have self-funded plans tend to be national companies, UPS, FedEx, Delta Airlines. They need to have uniform rules. The question is not whether the man on the street or the proverbial person on the street believes he or she has insurance. Somebody clearly underwrites the financial risks of his or her coverage. The question is, who regulates, the states or the feds? With respect to self-funded plans, Congress made its judgment quite clear that it would be the feds. We heard sort of briefly, and I think we answered this in our reply brief about the various mishmash of various contracts that purportedly give rise to a separate insurance policy. I think, as we said in our brief, there is no evidence that that could be made to fit into the statute, because there is an overlooking of the key qualifier word, insurance. But in any event, one example should suffice to see the circularity of the argument. The summary plan description that was touted and read to you is ordinarily understood, because it is, in fact, a planned document. Federal law requires that participants be given a summary plan description. Those are planned documents, and the effort to turn that into a state insurance that can be regulated under state law is merely yet another backdoor effort to regulate the self-funded plan itself as an insurance project. We heard that the true issue here is about the enforcement of contracts. This is not remotely about the enforcement of contracts. We know that because there is no breach of any sort alleged. The contracts themselves have deadlines, which with respect to the claims in this case, are longer than would be applied by Texas law, and that they have their own enforcement mechanisms, interest, and penalties that are provided by the statutes themselves. Those are the record on appeal at 228 and 245. With respect to the Methodist contract, we would have 45 days rather than 30 for the electronic claims, and THR does not impose penalties until 60 days. In any event, there could be no pretense that this is about the enforcement of a state court, of a, excuse me, state contract duty, because there has not been alleged, nor could there be alleged that we have breached. And in any effect, if you look at section 107 of chapter 1301, it is clear that the state word here could not sustain the burden of showing that this is about the enforcement of voluntarily entered contracts. Because section 107 expressly says that the duties and penalties imposed by chapter 1301 may not be waived by contract. And so, I go back to the point that I started on. The Hutchins case, we believe, is only the most recent manifestation of a very consistent set of rulings that you can find in the Schoenfeld case, in the Chichos case, and in every case where issues of this type have arisen. Well, why don't you address, though, I understand you're red lights on, but you can answer. So, address Mr. Skidmore's contention that Hutchins really dealt with a very different sort of statute. I don't understand what the difference is. The attempt in Hutchins was to apply the Pompei statute to the self-funded plan and its administrators. They were separate sections, each of which was considered separately by the federal district court, Judge Duffy. And in turn, by the Court of Appeals, that tried in many ways to impose deadlines that were shorter, that otherwise would be allowed by federal law, or that simply dealt with an issue of federal concern. I believe his main point of distinction is that the 11th Circuit somehow follows a different test than you followed. But if you look at the essence of the reasoning, the test in this court is whether this is an area of exclusive federal concern, which indeed it is. We saw a new reasoning in the back of Louisiana case, where the claim was that the insurer, Aetna, had delayed payment in order to avoid incurring claims under a stop loss policy. The essence of the reasoning on that claim was that for the state to attempt to regulate the speed of claim processing was a central issue of plan concern. And the ruling on that claim was that that claim was preempted. So in the substance of what was at issue in the Hudgens case, and what has been an issue in your cases, the application of the two-part test that this court has used in analogous cases involving other prompt pay claims all have led to the same result. All right, thank you, Mr. Sotomayor. Thank you, Your Honor. This case is under submission. Thank you. House